**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| DAVID HOLMES, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MEDTRONIC, INC.,<br><br>Defendant. | Case No. ____________________<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

**CLASS ACTION COMPLAINT**

Plaintiff David Holmes ("Plaintiff"), individually and on behalf of all others similarly situated (collectively, "Class members"), by and through his attorneys, brings this Class Action Complaint against Defendant Medtronic, Inc. ("Medtronic" or "Defendant"), and complains and alleges upon personal knowledge as to himself and information and belief as to all other matters.

**INTRODUCTION**

1. Plaintiff brings this class action against Medtronic for its failure to secure and safeguard the personally identifiable information ("PII") of its current and former customers from a cyberattack which Medtronic announced on or about April 24, 2026.

2. Medtronic is a medical device company that was founded in Minneapolis, Minnesota.

3. In or about April 2026, Medtronic discovered unauthorized activity on its network systems in which, upon information and belief, an unauthorized third party gained

access to its network systems and obtained files containing the PII of Medtronic's current and former customers, including Plaintiff (the "Data Breach").

4. Medtronic owed a duty to Plaintiff and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII against unauthorized access and disclosure. Medtronic breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect its customers' PII from unauthorized access and disclosure.

5. As a result of Medtronic's inadequate security and breach of its duties and obligations, the Data Breach occurred, and Plaintiff's and Class members' PII was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiff brings this action on behalf of himself and all persons whose PII was exposed as a result of the Data Breach.

6. Plaintiff, on behalf of himself and all other Class members, asserts claims for negligence, negligence *per se*, and unjust enrichment, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

***Plaintiff David Holmes***

7. Plaintiff is a citizen and resident of Grant County, Arkansas.

8. Plaintiff has used a Medtronic medical device for approximately twenty years.

9. On information and belief, at all relevant times Medtronic stored and maintained Plaintiff's PII on its network systems, including the systems accessed in the Data Breach. Plaintiff is unaware of the full extent of his PII that Medtronic stores.

10. As a direct result of the Data Breach, Plaintiff suffered injury and damages including, *inter alia*, a substantially increased and imminent risk of identity theft; the wrongful disclosure and loss of confidentiality of his highly sensitive PII; deprivation of the value of his PII; lost time and money mitigating the effects of the Data Breach; and overpayment for services that did not include adequate data security.

***Defendant Medtronic, Inc.***

11. Defendant Medtronic, Inc. is a Minnesota corporation with its principal place of business located at 710 Medtronic Parkway, Minneapolis, MN 55432. It can be served through its registered agent: Corporation Service Company, 2780 Snelling Avenue N, Suite 101, Roseville, MN 55113.

## JURISDICTION AND VENUE

12. The Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

13. This Court has general personal jurisdiction over Defendant because it maintains its principal place of business in this District.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant's principal place of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### *Overview of Medtronic*

15. Medtronic is a medical device company that claims to "treat more than 70 health conditions."[1] It claims to have treated over 79,000,000 patients and has over 174 active clinical trials.[2]

16. In the regular course of its business, Medtronic collects and maintains the PII of its current and former customers. Medtronic required Plaintiff and Class members to provide it with their PII as a condition of providing them with medical devices.

17. Medtronic's website contains a privacy notice (the "Privacy Policy"), which Medtronic claims covers data given to Medtronic "when you order Medtronic products and services, when you visit this website and Medtronic locations, when you contact Medtronic, or when you participate in Medtronic events, surveys, or clinical studies in the United States."[3] The Privacy Policy contains a list of instances in which it may share PII with others.[4] None of the instances include a cyberattack.

---

[1] *Key Facts*, MEDTRONIC, https://www.medtronic.com/en-us/our-company/key-facts.html (last accessed May 11, 2026).

[2] *Id*.

[3] *Medtronic Privacy Practice*, MEDTRONIC, https://www.medtronic.com/en-us/privacy-notice.html (last accessed May 11, 2026).

[4] *Id*.

18. Plaintiff and Class members are current or former customers of Medtronic who entrusted Medtronic with their PII.

***The Data Breach***

19. In or about April 2026, Medtronic experienced a cybersecurity incident that affected its information systems and "an unauthorized party accessed data in certain Medtronic corporate IT systems."[5] Upon information and belief, an unauthorized third party accessed Medtronic's network systems and acquired files containing the sensitive PII of Plaintiff and Class members.

20. In or about April 2026, the ShinyHunters cybercrime group claimed responsibility for the attack.[6] According to an article in SecurityWeek, the ShinyHunters group claimed to have stolen "more than 9 million records containing personal information."[7] ShinyHunters is "a notorious black-hat cybercriminal group" that specializes in "large-scale data breaches, extortion, and selling stolen user data on the dark web."[8] Upon information and belief, the cybercriminals responsible for the Data Breach attacked

---

[5] *Medtronic Statement on Unauthorized System Access*, MEDTRONIC (Apr. 24, 2026), https://news.medtronic.com/Medtronic-statement-on-unauthorized-system-access.

[6] Eduard Kovacs, *Medtronic Hack Confirmed After ShinyHunters Threatens Data Leak*, SECURITYWEEK (Apr. 28, 2026, 2:35 AM ET), https://www.securityweek.com/medtronic-hack-confirmed-after-shinyhunters-threatens-data-leak/.

[7] *Id*.

[8] Melissa Garcia, *ShinyHunters: Inside the Hacker Group Targeting Your SaaS Data (And How to Stop Them)*, DO CONTROL (May 4, 2026), https://www.docontrol.io/blog/shinyhunters.

Medtronic with the intent to steal Plaintiff's and Class members' PII and publish or sell the stolen information on the dark web.

21. Despite learning of the Data Breach on or before April 24, 2026, Medtronic has not informed Plaintiff or Class members of the nature of the Data Breach or of the PII compromised by cybercriminals. Medtronic's failure to promptly notify Plaintiff and Class members that their PII was accessed and stolen virtually ensured that the unauthorized third parties who exploited those security lapses could monetize, misuse or disseminate that PII before Plaintiff and Class members could take affirmative steps to protect their sensitive information. As a result, Plaintiff and Class members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

### *Defendant Knew that Criminals Target PII*

22. At all relevant times, Medtronic knew, or should have known, that the PII that it collected and stored was a target for malicious actors. Despite such knowledge, Medtronic failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class members' PII from cyberattacks that it should have anticipated and guarded against.

23. It is well known among companies that store sensitive personally identifiable information that such information—such as the PII stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata

breaches are on the rise for all kinds of businesses, including retailers . . . Many of them were caused by flaws in . . . systems either online or in stores."[9]

24. PII is a valuable property right.[10] The value of PII as a commodity is measurable.[11] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[12] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[13] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

25. Criminals piece together bits and pieces of compromised PII for profit by

---

[9] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019, 8:05 AM), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[10] *See* Marc van Lieshout, *The Value of Personal Data*, 457 Int'l Fed'n for Info. Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . ."), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[11] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[12] Organization for Economic Co-operation and Development, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD ILIBRARY (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[13] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERT. BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

creating "Fullz" packages. "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, Social Security number, date of birth, and more.

26. With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

27. The development of "Fullz" packages means that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and Class members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

28. Thus, even if certain information (such as contact information) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to criminals.

29. As a result of the real and significant value of these data, identity thieves and other cyber criminals have openly posted credit card numbers, Social Security numbers, PII, and other sensitive information directly on various internet websites making the information publicly available. This information from various breaches, including the

information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

30. Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[14]

31. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

***Theft of PII Has Grave and Lasting Consequences for Victims***

32. Theft of PII can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[15] [16]

---

[14] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

[15] *See* Federal Trade Commission, *What to Know About Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed May 11, 2026).

[16] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number,

33. Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[17]

34. Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft.[18]

35. There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[19]

36. It is within this context that Plaintiff and all other Class members must now live with the knowledge that their PII is forever in cyberspace and was specifically targeted

---

government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

[17] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[18] Identity Theft Resource Center, *2025 Consumer Impact Report*, IDENTITY THEFT RES. CTR. (2025), https://www.idtheftcenter.org/publication/itrc-2025-consumer-impact-report/ (last accessed May 11, 2026).

[19] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

and taken by someone intending to use that information for any number of improper purposes, fraud, and scams, including making the information available for sale on the black-market.

***Damages Sustained by Plaintiff and Class Members***

37. Plaintiff and Class members suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Defendant's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; and (vii) overpayment for services that were received without adequate data security.

## CLASS ALLEGATIONS

38. This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23.

39. Plaintiff intends to seek certification under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3) of the following Nationwide Class (the "Class"):

> All persons whose personally identifiable information was accessed and disclosed in the Data Breach to unauthorized persons.

40. Excluded from the Class are Medtronic, Inc., and its affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge.

41. Plaintiff reserves the right to amend or modify the Class definition as this case progresses.

42. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

43. **Numerosity**. The members in the Class are so numerous that joinder of each of the Class members in a single proceeding would be impracticable. While the exact number of Class members is unknown to Plaintiff at this time, based on information and belief, the Class consists of the approximately 9 million individuals whose PII was compromised by Defendant's Data Breach.

44. **Commonality**. Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

a. Whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class members' PII from unauthorized access and disclosure;

b. Whether Defendant had a duty not to disclose the PII of Plaintiff and Class members to unauthorized third parties;

c. Whether Defendant failed to exercise reasonable care to secure and safeguard Plaintiff's and Class members' PII;

d. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Plaintiff and Class members;

e. Whether Defendant breached its duties to protect Plaintiff's and Class members' PII; and

f. Whether Plaintiff and Class members are entitled to damages and the measure of such damages and relief.

45. **Predominance**. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

46. **Typicality**. Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had his PII compromised in the Data Breach. Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendant, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

47. **Adequacy**. Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class in that he has no interests adverse to, or that conflict with, the Class he seeks to represent. Plaintiff retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

48. **Superiority**. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to

be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress from Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

49. Plaintiff realleges and incorporates by reference paragraphs 1 through 48 as if fully set forth herein.

50. Medtronic owed a duty to Plaintiff and Class members to exercise reasonable care in safeguarding and protecting the PII in its possession, custody, or control.

51. Medtronic knew or should have known the risks of collecting and storing Plaintiff's and all other Class members' PII and the importance of maintaining secure systems. Medtronic knew or should have known of the many data breaches that targeted companies that collect and store PII in recent years.

52. Given the nature of Medtronic's business, the sensitivity and value of the PII it maintains, and the resources at its disposal, Medtronic should have identified the vulnerabilities to its systems and prevented the Data Breach from occurring.

53. Medtronic breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII entrusted to it—including Plaintiff's and Class members' PII.

54. It was reasonably foreseeable to Medtronic that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII to unauthorized individuals.

55. But for Medtronic's negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their PII would not have been compromised.

56. As a result of Medtronic's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and Class members suffered and will continue to suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost

opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Medtronic's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

**COUNT II**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiff and the Class)**

57. Plaintiff realleges and incorporates by reference paragraphs 1 through 48 as if fully set forth herein.

58. Medtronic's duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by businesses, such as Medtronic, of failing to employ reasonable measures to protect and secure PII.

59. Medtronic violated Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiff's and all other Class members' PII and not complying with applicable industry standards. Medtronic's conduct was particularly unreasonable given the nature and amount of PII it obtains and stores, and the foreseeable consequences of a data breach involving PII including, specifically, the substantial damage that would result to Plaintiff and the other Class members.

60. Medtronic's violations of Section 5 of the FTCA constitute negligence *per se*.

61. Plaintiff and Class members are within the class of persons that Section 5 of the FTCA was intended to protect.

62. The harm occurring as a result of the Data Breach is the type of harm Section 5 of the FTCA was intended to guard against. The FTC pursued enforcement actions against businesses such as Defendant, which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm suffered by Plaintiff and Class members as a result of the Data Breach.

63. It was reasonably foreseeable to Medtronic that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class members' PII to unauthorized individuals.

64. The injury and harm that Plaintiff and the other Class members suffered was the direct and proximate result of Medtronic's violations of Section 5 of the FTCA. As a result of Medtronic's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and all other Class members suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantial increase in the likelihood of, or imminent threat of, identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention,

detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Defendant's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

65. Plaintiff realleges and incorporates by reference paragraphs 1 through 48 as if fully set forth herein.

66. Plaintiff and Class members conferred a monetary benefit upon Medtronic in the form of monies paid for products and through the provision of their PII.

67. Medtronic accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class members. Medtronic also benefitted from the receipt of Plaintiff's and Class members' PII, as this was used to facilitate its operations and billing services.

68. As a result of Medtronic's conduct, Plaintiff and Class members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that customers paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

69. Medtronic should not be permitted to retain the money belonging to Plaintiff and Class members because Medtronic failed to adequately implement the data privacy

and security procedures for itself that Plaintiff and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

70. Plaintiff and Class members have no adequate remedy at law.

71. Medtronic should be compelled to provide for the benefit of Plaintiff and Class members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

**COUNT IV**
**Declaratory Judgment/Injunctive Relief**
**(On Behalf of Plaintiff and the Class)**

72. Plaintiff realleges and incorporates by reference paragraphs 1 through 48 as if fully set forth herein.

73. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

74. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class members' PII and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and Class members from further data breaches that compromise their PII. Plaintiff alleges that Defendant's data security measures remain inadequate.

75. Defendant's cybersecurity incident demonstrates the need for injunctive relief for Plaintiff and Class members. Defendant has not implemented measures to protect

PII, leaving Plaintiff and Class members without a way of protecting themselves.

76. Plaintiff and Class members continue to suffer injuries as result of the compromise of their PII and remain at imminent risk that further compromises of their PII will occur in the future.

77. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following: (a) Defendant owes a legal duty to secure Plaintiff's and Class members' PII, and to timely notify impacted individuals of a data breach under the common law, Section 5 of the FTCA and various state statutes, and (b) Defendant continues to breach this legal duty by failing to employ reasonable measures to secure PII in its possession.

a. Order Defendant to provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class members.

b. Order that, to comply with Defendant's explicit or implicit contractual obligations and duties of care, Defendant must implement and maintain reasonable security and monitoring measures, including, but not limited to:

i. prohibiting Defendant from engaging in the wrongful and unlawful acts alleged herein;

ii. requiring Defendant to protect, including through encryption, all data collected through the course of business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

iii. requiring Defendant to delete and purge the PII of Plaintiff and Class members unless Defendant can provide to the Court reasonable

justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class members;

iv. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of Plaintiff's and Class members' PII;

v. requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring, simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis;

vi. requiring Defendant to segment data by creating firewalls and access controls so that, if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

vii. requiring Defendant to conduct regular database scanning and securing checks;

viii. requiring Defendant to monitor ingress and egress of all network traffic;

ix. requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling PII, as well as protecting the PII of Plaintiff and Class members;

x. requiring Defendant to implement a system of tests to assess

its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs and systems for protecting personal identifying information;

xi. requiring Defendant to implement, maintain, review and revise as necessary a threat management program to appropriately monitor Defendant's networks for internal and external threats, and assess whether monitoring tools are properly configured, tested, and updated; and

xii. requiring Defendant to meaningfully educate all Class members about the threats that it faces because of the loss of its confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves.

78. If an injunction is not issued, Plaintiff and Class members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at, or implicating, Defendant. The risk of another such breach is real, immediate and substantial. If another breach occurs, Plaintiff and Class members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

79. The hardship to Plaintiff and Class members if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiff and Class members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable

prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

80. Issuance of the requested injunction will not disserve the public interest. In contrast, such an injunction would benefit the public by preventing another data breach at Defendant, thus eliminating the additional injuries that would result to Plaintiff and Class members whose confidential information would be further compromised.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in his favor and against Defendant as follows:

A. Certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B. Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C. Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of himself and the Class, seeks appropriate injunctive relief designed to prevent Defendant from experiencing another data breach by adopting and implementing best data security practices to safeguard PII and to provide or extend credit monitoring services and similar services to protect against all types of identity theft;

D. Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable under law;

E. Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F. Awarding Plaintiff and the Class such other favorable relief as allowable under law.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: May 14, 2026

Respectfully submitted,

/s/ *Melissa S. Weiner*

Melissa S. Weiner (MN Bar No. 0387900)
Ryan T. Gott (MN Bar No. 0397978)
**PEARSON WARSHAW LLP**
328 Barry Ave. S, Suite 200
Wayzata, MN 55391
Tel: 612-389-0600
Fax: 612-389-0610
mweiner@pwfirm.com
rgott@pwfirm.com

Ben Barnow*
Anthony L. Parkhill*
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Suite 1630
Chicago, IL 60606
Tel: 312-621-2000
Fax: 312-641-5504
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com

*Counsel for Plaintiff and the Proposed Class*
*pro hac vice forthcoming